DAMON K. DIAS, ESQ.
Nevada Bar No. 8999
E-mail: ddias@diaslawgroup.com
DIAS LAW GROUP, LTD.
601 S. 6TH Street
Las Vegas, Nevada 89101
Telephone: (702)380-3011
Facsimile: (702)366-1592
Attorney for Defendant

E-File: 6/20/2011

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>ASHOK EM SUDHAKAR aka ASHOK SUDHAKAR<br><br>                Debtor.<br>_____<br><br>THE TRUSTEES OF THE LABORERS HEALTH AND WELFARE TRUST FUND FOR NORTHERN CALIFORNIA; LABORERS VACATION-HOLIDAY TRUST FUND FOR NORTHERN CALIFORNIA; LABORERS PENSION TRUST FUND FOR NORTHERN CALIFORNIA; and LABORERS TRAINING AND RETRAINING TRUST FUND FOR NORTHERN CALIFORNIA,<br><br>                Plaintiffs,<br><br>        vs.<br><br>ASHOK EM SUDHAKAR aka ASHOK SUDHAKAR, fdba SUDHAKAR COMPANY INTERNATIONAL,<br><br>                Defendant.<br>_____ | BK-S 11-10976-MKN<br>CHAPTER 7<br><br><br>ADV. No.: 11-01127-MKN<br><br><br><br><br><br><br><br><br>**MOTION TO DISMISS** |

Comes now, Defendant, Ashok EM Sudhakar aka Ashok Sudhakar ("Defendant") in the

above named Adversary matter, by and through his attorney, Damon K. Dias, Esq., of the Dias Law

Group, Ltd., pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, made applicable to this

proceeding pursuant to Rule 7012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

1  Rules"), files this motion to dismiss complaint for failure to state a claim upon which relief can be

2  granted, and for failure to join a party under rule 19, and states as grounds for said motion the

3  following.

4  **I. FACTUAL ALLEGATIONS AND DISMISSAL OF THE INSTANT ACTION**

5     The Plaintiffs in the instant matter, the Laborers Trust Fund of Northern California, et.al.

6  hereinafter referred to as the "LTF", alleges injury based upon a check returned for insufficient funds

7  from a company, Sudhakar Company International (SCI), A California Corporation to LTF for fund

8  contributions.  LTF states the alleged check was signed by Defendant on or about November 19,

9  2009, though a true original or certified copy have not been attached nor provided.  SCI is not named

10  as a party to the instant Adversary, and arguably they are the only ones who could answer for the

11  short coming, if there were in fact one.  The contributions payable to LTF were timely paid when

12  Defendant was in charge of SCI, and it is not alleged otherwise.  In December, 2009, a third party

13  entity which was a secured creditor of SCI, Palm Desert National Bank, took over all operations and

14  control of SCI by way of an Article 9 sale.  A copy of the agreement is attached as Exhibit 1.

15  Thereafter, Defendant had no access and no control over the assets, liabilities and/or obligations of

16  SCI.  The article 9 takeover of SCI by the bank occurred less than a month after the Defendant is

17  alleged to have signed the check on behalf of SCI to LTF.   LTF alleges that it is entitled to relief

18  under 11 U.S.C. §523(a)(2), (a)(4) and (a)(6).  These sections of the code except from discharge

19  debts owed for money to the extent they were obtained by false pretenses/actual fraud, fraud by a

20  fiduciary, and for willful and malicious injury, respectively.  However, Plaintiff leaves out more

21  necessary facts and allegations than it includes. LTF is suing Defendant for certain obligations which

22  were incurred by a third party entity (which it is not suing) for money not owed by Defendant.  It

23  does not provide copies of the alleged check, nor does it take into account the fact that Defendant

24  had no control over SCI at the time the alleged check was returned for insufficient funds.

25     If, under a tortured reading of the complaint, it can be surmised that LTF attempts to allege

26  Defendant's liability attached at the time he signed the check to LTF in late November, 2009, there

27  is an intervening force, namely, the December 2009 article 9 sale which occurred after the alleged

28  check was signed but before it was presented to the bank which then alleviates Defendant's

responsibility.  Furthermore, LTF fails to allege that Defendant had knowledge that SCI would not honor the check to LTF after he was removed from control of the company, thereby failing on its 11 U.S.C. §523(a)(6) malicious injury claim.  Finally, LTF may not prevail, even were Defendant responsible for the check being returned for insufficient funds, on the facts alleged.  The Court may infer from the facts that there was a debt owed, which at the time of filing the bankruptcy was in default, and that it is now subject to a discharge under 11 U.S.C. §727.  "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d at 1261, citing *Ashcroft v. Iqbal*, ____ U.S.____, 129 S.Ct. 1937, 173 L.Ed.2d 868 (U.S. 2009).

## II.  LEGAL ARGUMENT

When a Creditor objects to the dischargeability of a debt, he carries the burden of proof, and the standard of proof is preponderance of the evidence.  See, *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).  "Exceptions to the dischargeability of a debt are construed strictly against a creditor's objections and liberally in favor of the debtor." *Haddad v. Haddad* (In re Haddad), 10 B.R. 276, 281 (Bankr. Nev., 1981).  A plaintiff bear(s) the burden of proving moral turpitude or intentional wrong as elements of false representation and fraud in order to have a claim declared nondischargeable" under 11 U.S.C. §523(a)(2).  *Haddad*, at 282.

LTF does not allege facts sufficient to show that Defendant committed fraud and/or intentional wrongs, by a preponderance of the evidence, such that it may survive a motion to dismiss. It states a vague allegation of a debt which is due and in default.  The debt alleged results from a check returned for insufficient funds from a company which Debtor did not control at the time it was returned.  The allegation is that since a check bounced, and since it was signed by Debtor (which has not been established), it must have been fraudulently negotiated.  In essence, LTF is asking the court to except from discharge a debt which is owed and in default, and in doing so, to infer fraudulent intent.  As stated herein, even if Defendant signed the alleged check, and even if it were later declined by the bank, Defendant was not in charge of the company which sent the check, nor was he in charge when the check would have been negotiated.  Even if he were still in charge of the company, his alleged actions were neither fraudulent nor intentional.  Arguably, as always occurred

3

in the past, the check would have been re-issued. And if not, and he were unable to pay it, Defendant might look at other options, including the filing of a bankruptcy, which he did here, in order to seek relief from debts which he could not possibly pay under his circumstances.

Debtor has been required to retain counsel to respond to Plaintiff's Complaint, and he reserves the right to request that his attorney's fees and costs be paid by Plaintiff.

## III. CONCLUSION

WHEREFORE, the Defendant prays for the following relief:

1.    That Plaintiff take nothing by way of its Complaint;

2.    That Defendant's request for attorney's fees be granted; and

3.    For such further relief as this Honorable Court deems just and proper.

DATED this 20th day of June, 2011.

DIAS LAW GROUP, LTD.


_/s/   Damon K. Dias_____
Damon K. Dias, Esq.
601 S. 6th Street
Las Vegas, NV 89101

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of June, 2011, I did serve a true and correct copy of the above documents by to the following (see attached receipt):

-- by electronic service and by depositing the same in the United States Mail, first class postage prepaid to:

Christian Raisner, Esq.
WEINBERG, ROGER & ROSENFELD, P.C.
1001 Marina Village Parkway, Suite 200
Alameda, CA 94501-1091
and
Kristina Hillman, Esq.
Law Office of Kristina L. Hillman, P.C.
729 Evans Avenue,
Reno, NV 89511

DATED: June 16th, 2011

Elizabeth E. Dias_____
An employee of Dias Law Group, Ltd.

Z:\Client Matters\BK Clients\Sudhakar, Ashok\adv CAL pension\mot to dismiss.wpd

4

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 1**

**AGREEMENT OF SALE**

# AGREEMENT OF SALE
## AND
## SECURED CREDITOR'S BILL OF SALE

This Agreement of Sale and Secured Creditor's Bill of Sale (this "Agreement") is made as of December 31, 2009 (the "Effective Date") by and among Palm Desert National Bank, whose address is 73-745 El Paseo, P.O. Box 1777 (92260), Palm Desert California 92260 ("Secured Creditor"), Sudhakar Company International, a California corporation, whose address is 7500 W. Lake Mead Blvd. #942, Las Vegas, NV 89128 ("Debtor"), Ashok EM Sudhakar, formerly known as Ashok Sudhakar, as an individual ("Sudhakar"), and SCI Pavement Services, LP, a Delaware limited partnership, whose address is 1450 N. Fitzgerald Avenue, Rialto, CA 92376 ("Buyer") and L2 Pavement, Inc., a Delaware corporation ("Indemnitor", whose address is c/o Relativity Capital LLC, 909 Third Avenue, Suite 2931, New York, NY 10022 and together with Buyer, the "Indemnitor Parties").

### RECITALS:

A.     Debtor is in the business of providing road striping, paving and other contracting services on behalf of federal, state and local governments and private parties (the "Business").

B.     Pursuant to the loan agreements listed on <u>Exhibit A-1</u> (the "SCI Loan Agreements") and all other documents executed in connection therewith or arising therefrom (collectively, the "SCI Loan Documents"), Secured Creditor provided credit and made loans to Debtor, which loans were guaranteed by Sudhakar and contained cross-collateralization provisions.

C.     Pursuant to the loan agreements listed on <u>Exhibit A-2</u> (the "SCI Affiliate Loan Agreements" and together with the SCI Loan Agreements, collectively, the "Loan Agreements") and all other documents executed in connection therewith or arising therefrom (the "SCI Affiliate Loan Documents" and together with the SCI Loan Documents, collectively, the "Loan Documents"), Secured Creditor provided credit and made loans to Sudhakar and certain affiliates of Sudhakar and Debtor (collectively, the "Debtor Group"), which loans were guaranteed by Debtor and Sudhakar and contained cross-collateralization provisions.

D.     Pursuant to the security agreements listed on <u>Exhibit A-3</u> (the "Security Agreements"), Debtor granted to Secured Creditor security interests in substantially all of its assets (the "Assets"). Except with respect to the Assets listed on <u>Exhibit B-2</u>, these security interests were duly perfected and secured Debtor's obligations to Secured Creditor arising under the Loan Agreements, and under the related Loan Documents, including without limitation the promissory notes listed on <u>Exhibit A-4</u>.

E.     Certain events of default have occurred and are continuing under the Loan Documents, as a result of which Secured Creditor accelerated the obligations of Debtor, Sudhakar and the other members of the Debtor Group under the Loan Documents (the "Debtor Group Obligations") and demanded payment thereof.

F.      As of the Effective Date, the Debtor Group Obligations are outstanding and unpaid in an aggregate amount of not less than ██████████ which consists of principal plus interest, costs, fees and other charges and, as a consequence thereof, Secured Creditor is entitled to exercise its remedies in default including, but not limited to the disposition of some or all of the Assets.

G.      As of immediately prior to the execution and delivery of this Agreement, it is the belief of the parties hereto that the security interests and liens granted Secured Creditor under the Loan Documents, except for the security interest and liens granted in the Assets listed on Exhibit B-2, constitute perfected, first priority security interests in and liens on the Assets subject to permitted liens, if any.

H.      Secured Creditor has determined to make a disposition of some, but not all, of the Assets to Buyer, and Buyer has agreed to purchase from Secured Creditor, the assets described in Exhibit B-1 (the "Purchased Assets"), which constitute part of the Assets.

I.      Indemnitor is an affiliate of Buyer and has agreed to provide certain indemnifications to Secured Creditor as set forth in this Agreement in order to induce Secured Creditor to execute this Agreement, which Secured Creditor would not do without such inducements.

**NOW THEREFORE**, with the foregoing Recitals being incorporated by reference herein, and for due and adequate consideration, the sufficiency of which is hereby acknowledged, Secured Creditor, Debtor, Buyer and Indemnitor, intending to be legally bound, hereby agree as follows:

1.      **CONSIDERATION.**

In return for Secured Creditor's sale and transfer of the Purchased Assets to Buyer, Buyer shall: (a) pay Secured Creditor consideration in the sum of ████████ and (b) at the direction of Secured Creditor, pay Secured Creditor's attorneys, the sum of ██████ in amount paid to reimburse the costs and expenses incurred by Secured Creditor in connection with this Agreement and the transactions contemplated hereby. The aggregate amounts to be paid pursuant to the foregoing clauses (a) and (b) shall be paid at the Closing (as defined below) and constitute the purchase price (the "Purchase Price") for the Purchased Assets. Debtor, Sudhakar, Secured Creditor, and Buyer acknowledge and agree that to the best of their knowledge the Purchase Price is fair and reasonable and represents the fair equivalent value of, and fair consideration for, the Purchased Assets. Debtor and Sudhakar hereby expressly consent to the Secured Party's sale of the Purchased Assets to Buyer pursuant to Section 9610(b) of the California Uniform Commercial Code. Notwithstanding the foregoing, Buyer shall not assume or be deemed to have assumed and shall not be responsible for any debts, obligations or liabilities of Debtor, Sudhakar or of any other member of the Debtor Group whether accruing prior to the Closing or thereafter.

2.      **TRANSFER OF OWNERSHIP.**

Subject to the terms and conditions of this Agreement, at the Closing (as defined

below), Secured Creditor hereby agrees to grant, sell, assign, deliver, transfer and convey to the Buyer pursuant to Section 9610(b) of the California Uniform Commercial Code ownership of, and all of Secured Creditor's right, title, and interest in and to, the Purchased Assets free and clear of any lien claim or interest of Secured Creditor without recourse, representation or warranty, including, without limitation, as to the title of Debtor and Secured Creditor to the Purchased Assets and the priority and perfection of the security interests and liens granted to Secured Creditor in the Purchased Assets, except as set forth hereafter. All tangible personal property conveyed as part of the Purchased Assets shall be accepted by Buyer in "where is" and "as is" condition as of the Closing. Buyer is acquiring the Purchased Assets only and not all of the collateral pledged by each member of the Debtor Group to Secured Creditor. The closing of the purchase and sale of the Purchased Assets contemplated by this Agreement (the "Closing") will take place at 10:00 a.m. on the second (2nd) business day after satisfaction of the conditions set forth in Section 8 below, excluding conditions that, by their terms, cannot be satisfied until the Closing, but subject to the written waiver of such conditions by Buyer, at the offices of Nethery & Ofseyer, 74-000 Country Club Drive, Suite H-1, Palm Desert CA 92260, unless another date, time or place is agreed to in writing by the parties.

3.    **REPRESENTATIONS AND WARRANTIES OF SECURED CREDITOR.**

Secured Creditor represents and warrants to Buyer as of the Effective Date and as of the Closing as follows:

(a)    Secured Creditor is a national banking association duly organized and validly existing under the laws of the United States;

(b)    Secured Creditor has all necessary right, power, and authority to consent to the sale of the Purchased Assets, and to execute, deliver, and perform its obligations under this Agreement and to carry out the transactions contemplated hereby;

(c)    The execution, delivery, and the consummation by Secured Creditor of the transactions contemplated by this Agreement have been duly authorized by all requisite action of Secured Creditor (none of which actions has been modified or rescinded and all of which actions are in full force and effect); this Agreement and all other documents contemplated herein (collectively, the "Transaction Documents") have been duly executed and delivered by Secured Creditor and, assuming the due authorization, execution and delivery by Buyer, Debtor and Sudhakar, constitute legal, valid, and binding obligations of Secured Creditor, enforceable against Secured Creditor in accordance with their terms, subject to any limitations on enforceability under law or equity;

(d)    To the best of Secured Creditor's actual knowledge, no consent from any governmental entity or any other person is required for (i) the execution and delivery by Secured Creditor of the Transaction Documents in accordance with their terms, (ii) the consummation by Secured Creditor of the transactions contemplated hereby, or (iii) the transfer of the Purchased Assets to Buyer;

(e)    To the best of Secured Creditor's actual knowledge, the matters and facts set forth in Recitals A through H, inclusive, above are true and correct;

(f)     Secured Creditor has no actual knowledge of any person or party having an interest in, right to or claim upon all or any of the Purchased Assets other than Debtor, Secured Creditor and those persons to which the notices contemplated in Section 6(e) below are directed;

(g)     Secured Creditor has no actual knowledge of any person or party having or claiming a lien upon all or any of the Purchased Assets other than Secured Creditor and those persons to which the notices contemplated in Section 6(d) below are directed;

(h)     Secured Creditor has no actual knowledge of any person or party having or claiming title or ownership of all or any of the Purchased Assets other than Debtor and Secured Creditor;

(i)     Secured Creditor has not previously sold any right, title or interest in or to the Purchased Assets; and

(j)     To the best of Secured Creditor's actual knowledge, and based on information supplied by Buyer, (i) Secured Creditor has given such notices as may be required and has taken such other and further actions as may be necessary in order to implement the intent of Secured Creditor, Debtor, Buyer and Indemnitor hereunder and to convey to Buyer all right, title and ownership of Debtor and Secured Party in and to the Purchased Assets, and (ii) Secured Creditor has the right, as a secured creditor, to sell the Purchased Assets to the Buyer as set forth herein.

4.     **REPRESENTATIONS AND WARRANTIES OF DEBTOR AND SUDHAKAR.**

Debtor and Sudhakar, on a joint and several basis, represent and warrant to Buyer as of the Effective Date and as of the Closing as follows:

(a)     Debtor is a corporation duly organized, validly existing, and in good standing under the laws of the State of California;

(b)     Debtor has all necessary right, power, and authority to sell the Purchased Assets, and to execute, deliver, and perform its obligations under this Agreement and to carry out the transactions contemplated hereby;

(c)     The execution, delivery, and the consummation by Debtor of the transactions contemplated by this Agreement have been duly authorized by all requisite corporate action of Debtor (none of which actions has been modified or rescinded and all of which actions are in full force and effect); the Transaction Documents have been duly executed and delivered by Debtor and, assuming the due authorization, execution, and delivery by Secured Creditor and Buyer, constitute legal, valid, and binding obligations of Debtor, enforceable against Debtor in accordance with their terms, subject to any limitations on enforceability under law or equity;

(d)     No consent from any governmental entity or any other person is required for (i) the execution and delivery by Debtor of the Transaction Documents in

accordance with their terms, (ii) the consummation by Debtor of the transactions contemplated hereby, or (iii) the transfer of the Purchased Assets to Buyer;

(e)    The matters and facts set forth in Recitals A through H, inclusive, above are true and correct;

(f)    Debtor has no actual knowledge of any person or party having an interest in, right to or claim upon all or any of the Purchased Assets other than Debtor, Secured Creditor and those persons to which the notices contemplated in Section 6(d) below are directed;

(g)    Debtor has no actual knowledge of any person or party having or claiming a lien upon all or any of the Purchased Assets other than Secured Creditor;

(h)    Debtor has no actual knowledge of any person or party having or claiming title or ownership of all or any of the Purchased Assets other than Debtor and Secured Creditor;

(i)    Debtor has not previously sold any right, title or interest in or to the Purchased Assets;

(j)    Since June 30, 2009, neither Debtor nor Sudhakar have removed, or permitted the removal of, any material item of Purchased Assets from any premises owned or leased by Debtor or Sudhakar other than removals in the ordinary course of business;

(k)    Schedule 4(k) contains a list of each currently enforceable contract or agreement related to the business of Debtor or the Purchased Assets (each, a "Material Business Contract" and, collectively, the "Material Business Contracts"). Debtor has delivered to Buyer or made available to Buyer a copy of each written Material Business Contract. Subject to the assumption of the Material Business Contracts by Buyer, each Material Business Contract is in full force and effect and represents a valid, binding and enforceable obligation of Debtor in accordance with the respective terms thereof and, to Debtor's knowledge, represents a valid, binding and enforceable obligation of each of the other parties thereto other than with respect to any such Material Business Contract which may expire after the Effective Date and prior to the Closing in accordance with its terms;

(l)    Except as set forth in Schedule 4(l), there are no pending or, threatened claim, action, injunction, order, judgment, decree, ruling, charge, suit or proceeding, grievance, arbitral action, governmental inquiry, criminal prosecution, hearing or other investigation (an "Action") by any person or governmental authority against or relating to Debtor or Sudhakar which relate to the business of Debtor, the Purchased Assets or to which any of the Purchased Assets are subject nor have there been any such Actions pending against or affecting Debtor or Sudhakar arising out of the business of Debtor or the Purchased Assets during the three years preceding the Closing, other than those which would not, in any individual case, as of the date hereof, have a material adverse effect;

(m)    Except as set forth in Schedule 4(m), Debtor is in compliance with each, and has not received any claim or notice that it is not in compliance with any law or governmental order applicable to Debtor, and Debtor has been in compliance with industry standards, except as would not, in any individual case, as of the date hereof, have a material

adverse effect;

(n)    Schedule 4(n) is a true and correct list of all insurance policies (the "Business Insurance Policies") maintained by the Debtor or Sudhakar with respect to all or any portion of the Purchased Assets, together with a true and correct statement of the loss history for each claim in excess of Twenty-Five Thousand Dollars ($25,000) filed pursuant to such policy for the three (3)-year period immediately preceding the date of this Agreement. All of the Business Insurance Policies are in full force and effect and Sellers have not received any notice of cancellation or non-renewal of any material Business Insurance Policy;

(o)    The Purchased Assets, together with the Real Property, as defined in the Deed in Lieu of Foreclosure Agreement, the Equipment listed on Exhibit B-3(A) and the Assets listed on Exhibit B-3(B), constitute all of the assets necessary and sufficient to conduct the operations of the Debtor in accordance with Debtor's current practices;

(p)    The purchase and sale of the Purchased Assets is "commercially reasonable" as described in Section 9610 of the California Uniform Commercial Code; and, Debtor and Sudhakar acknowledge that they have received reasonable notice of the sale in compliance with Section 9611(b) of the California Uniform Commercial Code;

(q)    Debtor has delivered to Buyer copies of the following financial statements (the "Unaudited Financial Statements") relating to the Business, which are included on Schedule 4(q): (i) the unaudited balance sheets of Debtor relating to the Business as at March 31, 2008 and March 31, 2009, and related unaudited statements of results of operations of the Business (the "Annual Unaudited Financial Statements"), and (ii) the unaudited balance sheet of Debtor relating to the Business as at September 30, 2009 (the "Most Recent Balance Sheet"), and the related statement of results of operations and cash flows of the Business for the seven months ended September 30, 2009 (the items referred to in clause (ii), the "Interim Unaudited Financial Statements"). March 31, 2008, March 31, 2009 and September 30, 2009 are collectively referred to as the "Unaudited Financial Statement Dates";

(r)    Except as set forth on Schedule 4(r), each of the Financial Statements (i) has been prepared in good faith based on Debtor's reasonable estimates and judgments as to the financial performance of the Business and the books and records of Debtor pertaining to the Business; (ii) has been prepared on a consistent basis in accordance with generally accepted accounting principles throughout the period indicated and (iii) fairly presents, in all material respects, the financial condition, results of operations and cash flows of the Business as at and for the periods ending on the respective Unaudited Financial Statement Dates, except as otherwise noted therein and subject to the absence of notes;

(s)    There are no liabilities of the Business other than any such liabilities (i) reflected or reserved against on the Unaudited Financial Statements, and (ii) consistent with the types of liabilities reflected on the Unaudited Financial Statements, incurred since the date of the Most Recent Balance sheet in the ordinary course of business;

(t)    Except as set forth on Schedule 4(t), since the date of the Most Recent Balance Sheet, (i) Debtor has operated the Business in the ordinary course of business and (ii) no event has occurred which would be reasonably likely to be material to the Business or the

Assets. Without limiting the foregoing, since the date of the Most Recent Balance Sheet, Debtor has not, with regard to the Business, canceled any other debts or claims of material value, waived any rights of material value, sold, transferred or conveyed any of its properties or assets of material value (whether real, personal or mixed, tangible or intangible); or made any material capital expenditures or commitments; and

(u)    no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the sale of the Assets based upon arrangements made by or on behalf of Debtor or its affiliates.

In the event of a breach of any of the foregoing representations and warranties, Buyer shall have the right to offset the amount of any damages it may sustain as a result of such breach against any distributions that Sudhakar or any of his permitted designees, successors and assigns may otherwise be entitled to receive as a limited partner in Buyer.

5.           **REPRESENTATIONS AND WARRANTIES OF BUYER.**

Buyer represents and warrants to Secured Creditor as of the Effective Date and as of the Closing as follows:

(a)    Buyer is a limited partnership duly organized, validly existing, and in good standing under the laws of Delaware;

(b)    Buyer has all necessary right, power and authority to purchase the Purchased Assets, and to execute, deliver and perform its obligations under this Agreement and to carry out the transactions contemplated hereby;

(c)    The execution, delivery, and the consummation by Buyer of the transactions contemplated by this Agreement have been duly authorized by all requisite limited partnership action of Buyer (none of which actions has been modified or rescinded and all of which actions are in full force and effect); the Transaction Documents have been duly executed and delivered by Buyer and, assuming the due authorization, execution and delivery by Secured Creditor, Debtor and Sudhakar, constitute legal, valid and binding obligations of Buyer, enforceable against Buyer in accordance with their terms, subject to any limitation on enforceability under law or equity; and

(d)    No consent from any governmental entity or any other person is required for (i) the execution and delivery by Buyer of the Transaction Documents in accordance with their terms, (ii) the consummation by Buyer of the transactions contemplated hereby, or (iii) the transfer of the Purchased Assets to Buyer.

(e)    Buyer has provided to Secured Creditor certain information, based on which Secured Creditor has given such notices as may be required in order to implement the intent of Secured Creditor, Debtor, and Buyer hereunder and to convey to Buyer all right, title and ownership of Debtor and Secured Party in and to the Purchased Assets, and Buyer has the right to purchase the Purchased Assets from the Seller as set forth herein.

6.     **COVENANTS OF DEBTOR AND SUDHAKAR.**

Debtor and Sudhakar covenant and agree with the Buyer as follows:

(a)     ACCESS, INFORMATION AND DOCUMENTS.

From the date hereof until the Closing, upon reasonable notice, Debtor shall afford Buyer and its officers, employees, agents, accountants, advisors, bankers and other representatives (collectively, "Representatives") reasonable access to the properties, offices, plants and other facilities, books and records of Debtor relating exclusively or primarily to the Business.

(b)     CONDUCT OF BUSINESS PENDING CLOSING.

From the date hereof until the Closing, unless Buyer shall otherwise agree in writing, Debtor shall: (i) operate the Business in the ordinary course of business consistent with past practice in all material respects; (ii) use its commercially reasonable efforts to preserve the Purchased Assets and business relationships with whom Debtor deals in connection with the conduct of the Business in the ordinary course; (iii) perform all of Debtor's obligations under the existing contracts with third parties; (iv) comply with all applicable laws and keep in force all permits necessary to the operation of the Business; (v) deliver to Buyer any notices of any defaults or noncompliance, cease and desist orders, notices of review or requests for information received from parties to any material contract, governmental authorities or insurers relating to the Business or its operations and any notice or other information regarding pending or threatened litigation with respect to the Business or its operations.

Between the date hereof and the Closing, without the prior consent of Buyer, Debtor shall not, in connection with the Business:

(i)     sell, transfer, subject to any lien or otherwise dispose of any Purchased Assets or any interest therein;

(ii)     acquire any corporation, partnership, limited liability company, other business organization or division thereof or any assets other than in the ordinary course of business;

(iii)     incur any indebtedness in excess of $5,000 in the aggregate;

(iv)     enter into any contract, agreement or arrangement that would be a material contract if entered into prior to the date hereof, other than any such contracts, agreements or arrangements entered into in the ordinary course of business (including contracts, agreements or arrangements with customers, vendors or clients) or terminate, allow to expire, amend or otherwise change the course of dealing pursuant to any material contract;

(v)     take any affirmative action or fail to take any reasonable action within Debtor's control, as a result of which action or failure to act, any material adverse affect on the conditions or operations of the Purchased Assets or Business occurs or is likely to occur;

(vi)     take any or omit to take any action that would cause or permit Debtor to violate any covenant set forth in this Agreement or that would be

otherwise contrary to or in breach of any of the terms or provisions of the Agreement, including, causing any of the representations or warranties of Debtor contained herein to be or become untrue in any respect;

(vii)  make any change in the Business or its operations or in the manner of conducting the Business other than changes made in the ordinary course of business;

(viii)  cancel any debts or claims of material value or waive any rights of material value; or

(ix)  institute, settle or agree to settle any litigation, action or proceeding before any court or governmental authority.

(c)  CONSENTS AND APPROVALS.

Debtor and Sudhakar shall use commercially reasonable efforts to obtain prior to the Closing all consents, authorizations, and approvals under all material contracts, permits, applicable laws, judgments, decrees, and orders of any government authority or of any other person required to be obtained by them in connection with the execution, delivery, and performance of the Agreement.

(d)  REFUNDS AND REMITTANCES.

After the Closing, if Debtor, Sudhakar or any of their affiliates receive any payment, refund or other amount that is properly due and owing to Buyer in accordance with the terms of this Agreement, Debtor and Sudhakar promptly shall remit, or shall cause to be remitted, such amount to Buyer.

(e)  NOTIFICATION.

Between the date of this Agreement and the Closing, Debtor shall promptly notify Buyer in writing of any (i) fact or circumstance that would have or that reasonably could be expected to have a material adverse effect on the condition, results or operations of the Business, including, and (ii) complaints of governmental authorities or notices of violations of any applicable law, investigations or hearings or adjudicatory proceedings (or communications indicating that the same may be contemplated) or of any other matter, and Debtor shall keep Buyer fully informed of such events and permit its representatives to participate in all discussions relating thereto. Debtor shall promptly notify Buyer in writing of the discovery of any circumstance, or the impending occurrence of any event that would cause or constitute a breach of any of Debtor's representations, warranties or covenants and shall use its best efforts to prevent or promptly remedy the same.

(f)  REASONABLE EFFORTS.

Between the date of this Agreement and the Closing, Debtor and Sudhakar will use their commercially reasonable efforts to take or cause to be taken all action and to assist and cooperate with Buyer and Secured Creditor in doing, all things reasonably necessary, proper or advisable, including as required by applicable law, to consummate and make effective, in the most expeditious manner practicable, the Closing, including assembling the Purchased Assets

for sale and causing the closing conditions specified in Section 5 hereof to be satisfied as soon as reasonably practicable, but in all events before the Termination Date.

     (g)    NO SHOP; EXCLUSIVITY.

From the date hereof until the earlier of the Closing or the termination of this Agreement, Debtor, Sudhakar or any of their respective officers, employees, agents or representatives will not, (i) solicit or respond to any offers, bids, negotiations or inquiries with respect to a sale, merger, consolidation, reorganization or other business combination pursuant to which the stock, assets or business of Debtor would be combined with that of, or sold to, any acquirer or any other business or entity; (ii) negotiate with any other persons with respect to any offers, bids, negotiations or inquiries with respect to the same; (iii) furnish any information with respect to the business, activities, operations, assets or liabilities of the Business, or other similar matters, to any persons whatsoever with respect to the foregoing; nor (iv) proceed or continue with negotiations in respect of the foregoing which may be in progress as of the date of this Agreement. Debtor will notify Buyer promptly by telephone, and thereafter promptly confirm in writing, if any such offer, bid, negotiation or inquiry is requested from or received by Debtor, any affiliate or any of their respective officers, employees, agents or representatives. In the event any such offer, bid, negotiation or inquiry is received, Debtor shall promptly inform the maker thereof of the existence of the provisions of this Section 6(g) (without revealing Buyer by name) and Debtor, for itself or on behalf of any affiliate thereof or any of their respective owners, officers, employees, agents or representatives, shall reject such offer, bid, negotiation or inquiry.

     (h)    NON-COMPETITION; NON-SOLICITATION.

        (i)    For a period of five (5) years from the Closing, Debtor, Sudhakar and their affiliates will not, without the prior written consent of Buyer, directly or indirectly, own, manage, operate, control, be connected with as an officer, employee, consultant, partner or otherwise, or otherwise engage or participate in any business competitive with the Business.

        (ii)    For a period of five (5) years from the Closing, Debtor, Sudhakar and their affiliates will not, without the prior written consent of Buyer: (A) directly or indirectly, solicit the employment of, or offer employment to, any person who is then an employee of Buyer or an affiliate of Buyer, or who has terminated employment without the consent of Buyer within six (6) months of the solicitation or offer or; (B) in any way interfere with the relationship between Buyer and any employee of Buyer.

        (iii)    For a period of five (5) years from the Closing, Debtor, Sudhakar and their Affiliates will not, without the prior written consent of Buyer; (A) directly or indirectly, solicit any person or entity to purchase any goods or services of the type or nature offered or sold by, or in connection with, the Business; (B) directly or indirectly, induce or attempt to induce any person to cease doing business with Buyer; or (C) disparage Buyer or any of its Affiliates shareholders, partners, members, directors, officers employees or agents.

(iv)    The parties specifically acknowledge and agree that the remedy at law for any breach of this Section 6(h) will be inadequate and that Buyer, in addition to any other relief available to it, may be entitled to temporary and permanent injunctive relief without the necessity of proving actual damage. The rights and remedies of the parties to this Agreement are cumulative and not alternative.

7.    **TRADE NAME.**

Buyer will acquire as part of the Purchased Assets the exclusive right to use the name of the Business, and any variation thereof and the goodwill associated therewith and none of Debtor or its affiliates will use the name "Sudhakar Company International", "Works Striping & Marking Service, Inc." or the tradename "SCI."

8.    **CONDITIONS PRECEDENT TO BUYER'S OBLIGATION TO PURCHASE THE PURCHASED ASSETS.**

The obligation of Buyer to purchase the Purchased Assets is subject to the fulfillment prior to or at the Closing of the following conditions:

(a)    REPRESENTATIONS, WARRANTIES AND PERFORMANCE.

The representations and warranties of Debtor, Sudhakar and Secured Creditor contained in this Agreement shall be true and correct both when made and as of the Closing, or in the case of representations and warranties that are made as of a specified date, such representations and warranties shall be true and correct as of such specified date. Debtor, Sudhakar and Secured Party shall have performed all obligations and agreements and complied with all covenants and conditions required by this Agreement to be performed or complied with by Debtor prior to or at the Closing.

(b)    CONSENTS AND APPROVALS.

Debtor shall have obtained all consents, authorization and approvals under all applicable laws, judgments, decrees and orders of any court or governmental authority or of any other person required to be obtained by Debtor in connection with the execution, delivery and performance of this Agreement and the consummation of the transaction.

(c)    NO MATERIAL ADVERSE EFFECT.

Between the date hereof and the Closing, there shall be no event or condition that has, or is reasonably likely to have, a material adverse effect on the results, operations or condition of the Business.

(d)    NO ADVERSE PROCEEDINGS.

No order, decree or injunction of any court or agency of competent jurisdiction shall be in effect, no order, decree or injunction of any court or agency of competent jurisdiction shall have been sought or threatened, and no applicable law shall have been enacted or adopted, that enjoins, prohibits or makes illegal consummation of the transactions contemplated hereby, provided, however, that Buyer and Debtor shall use their best efforts to prevent any such

applicable law or other order, and to appeal as promptly as possible any injunction, decree or other order that may be entered.

        (e)      AGREEMENTS AND CONDITIONS.

On or before the Closing, Debtor shall have complied with and duly performed in all material respects all agreements and covenants on its part to be complied with and performed pursuant to or in connection with this Agreement on or before the Closing.

        (f)      DELIVERY OF PURCHASED ASSETS

Secured Creditor shall have delivered to Buyer such of the Purchased Assets as are in the possession, custody or control of Secured Creditor.

        (g)      ACQUISITION OF REAL PROPERTY

Pursuant to the terms and conditions of that certain *Purchase and Sale Agreement and Joint Escrow Instructions (the "Purchase Agreement")* by and among Ash Sudhakar, EAS Investment and Development, LLC and Buyer, the Escrow (as defined in the Purchase Agreement) shall be in a position to close concurrently with the Closing herein and there shall be no conditions to close of the Escrow that have not either been satisfied or waived by the party benefited by such conditions.

        (h)      TRANSFER STATEMENT

Secured Party shall have executed and delivered to Buyer a transfer statement in the form of Exhibit C.

9.    **CONDITIONS TO SECURED CREDITOR'S OBLIGATION TO DISPOSE OF THE PURCHASED ASSESTS.**

The obligation of Secured Creditor to dispose of the Purchased Assets as set forth in this Agreement is subject to fulfillment prior to or at the Closing of the following conditions:

        (a)      REPRESENTATIONS, WARRANTIES AND PERFORMANCE.

The representations and warranties of Debtor, Sudhakar and Buyer contained in this Agreement shall be true and correct both when made and as of the Closing, or in the case of representations and warranties that are made as of a specified date, such representations and warranties shall be true and correct as of such specified date. Debtor, Sudhakar Buyer and Indemnitor shall have performed all obligations and agreements and complied with all covenants and conditions required by this Agreement to be performed or complied with by each such party prior to or at the Closing.

        (b)      NO ADVERSE PROCEEDINGS.

No order, decree or injunction of any court or agency of competent jurisdiction shall be in effect, no order, decree or injunction of any court or agency of competent jurisdiction shall have been sought or threatened, and no applicable law shall have been enacted or adopted, that

enjoins, prohibits or makes illegal consummation of the transactions contemplated hereby, provided, however, that Buyer and Debtor shall use their best efforts to prevent any such applicable law or other order, and to appeal as promptly as possible any injunction, decree or other order that may be entered.

        (c)     PAYMENT OF PURCHASE PRICE.

Buyer shall have delivered to Secured Creditor the Purchase Price as described in Section 1.

        (d)     ACQUISITION OF REAL PROPERTY

Pursuant to the terms and conditions of the Purchase Agreement, the Escrow shall be in a position to close concurrently with the Closing herein and there shall be no conditions to close of the Escrow that have not either been satisfied or waived by the party benefited by such conditions.

10.  **SURVIVAL OF REPRESENTATIONS AND WARRANTIES AND COVENANTS.**

All representations and warranties of Buyer, Secured Party, Debtor and Sudhakar contained in this Agreement shall survive the Closing in perpetuity.





extent arising a~~s~~ ~~nce of: (a) Debtor's ownership and operation of~~
the Purch ~~g the Closing, to~~
the exte ~~by~~
B ~~losing,~~
~~o such~~
~~a~~

## 12. FURTHER ASSURANCES.

Secured Creditor and Buyer agree to execute and deliver any other instruments of transfer and conveyance and do all further acts and things (without material cost to either party) as may be reasonably requested by Secured Creditor or Buyer, as the case may be, after the Closing to transfer and deliver to Buyer, or to aid and assist Buyer in collecting and reducing to Buyer's possession, any and all of the Purchased Assets.

## 13. TAX ALLOCATION

Buyer shall prepare an allocation of the Purchase Price (and all other capitalizable costs) among the Purchased Assets for all purposes (including financial accounting and tax purposes) (the "Allocation"). Debtor and Sudhakar shall accept such Allocation for all financial accounting and tax purposes. Secured Creditor is in no way bound by such Allocation for any purpose.

## 14. TERMINATION

(a)    TERMINATION

This Agreement may be terminated at any time prior to the Closing:

(i)    by mutual written consent of Buyer, Debtor, Sudhakar and Secured Party;

(ii)    by Buyer if Debtor, Sudhakar or Secured Party breaches or fails to perform any of their representations, warranties or covenants contained in this Agreement in favor of Buyer and such breach or failure to perform has not been waived in writing by Buyer;

(iii)    by Buyer, if any of the conditions set forth in Section 8, and by Secured Creditor if any of the conditions set forth in Section 9, shall have become incapable of fulfillment prior to December 31, 2009 (the "Termination Date"); and such failure has not been waived in writing by Buyer or Secured Creditor, as the case may be;

(iv)     by Buyer or Secured Creditor in the event that any governmental authority shall have issued an order, decree or ruling or taken any other action restraining, enjoining or otherwise prohibiting the Closing and such order, decree, ruling or other action shall have become final and nonappealable; or

(v)      by Secured Party if Buyer, Debtor, Sudhakar or Indemnitor breaches or fails to perform any of their representations, warranties or covenants contained in this Agreement in favor of Secured Creditor and such breach or failure to perform has not been waived in writing by Secured Creditor.

**(b)     EFFECT OF TERMINATION**

In the event of termination of this Agreement as provided in Section 14(a), this Agreement shall forthwith become void, and there shall be no liability on the part of any party, except for the provisions relating to broker's fees and finder's fees, confidentiality, transaction fees and expenses, notices, third-party beneficiaries, governing law, submission to jurisdiction and this Section 14(b). Notwithstanding the foregoing, nothing herein shall relieve any party from liability for any breach of this Agreement or any agreement made pursuant to this Agreement.

## 15.   ENTIRE AGREEMENT; ASSIGNMENT.

(a)      This Agreement and any other documents executed or entered into in connection herewith constitute the entire agreement between the parties pertaining to the subject matter hereof and supersede all prior and contemporaneous agreements, understandings, negotiations, and discussions, whether oral or written, of the parties. There are no warranties, representations, or other agreements between the parties in connection with the Purchased Assets hereof except as specifically set forth herein.

(b)      None of the parties hereto may assign their rights and obligations under this Agreement without the prior written consent of Buyer and Secured Creditor. All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective permitted transferees, successors, and assigns. Except as specifically set forth or referred to herein, nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity other than the parties hereto and their successors or permitted assigns, any rights or remedies under or by reason of this Agreement.

## 16.   AMENDMENT.

The parties may amend this Agreement at any time, but only by an instrument in writing duly executed and delivered on behalf of each of the parties.

## 17.   TRANSACTION EXPENSES.

Except as otherwise expressly provided for herein, each of the parties shall assume and bear all expenses, costs, and fees incurred or assumed by such party in the preparation and execution of this Agreement, the consummation of the transactions described herein, and in compliance with the terms and provisions hereof, whether or not

the transactions herein provided shall be consummated.

18.  **NOTICES.**

All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered or mailed, certified or registered first-class postage prepaid, or transmitted by confirmed facsimile followed by first class mail, postage prepaid, or sent by recognized overnight courier:

(a)    if to Secured Creditor:
Palm Desert National Bank
3296 Guasti Road, Suite 120
Ontario, California 91761
Tel: (909) 786-4180
Fax: (909) 786-4180
Attention: Robert Franks

*with a copy (which shall not constitute notice) to:*
Nethery & Ofseyer LLP
74000 Country Club Drive, Suite H-1
Palm Desert, California 92260
Tel: (760) 356-3355
Fax: (760) 346-7057
Attention: Martin Nethery, Esq.

(b)    if to Debtor:
Sudhakar Company International
7500 W. Lake Mead Blvd. #942
Las Vegas, NV 89128
Tel: (702) 232-7819
Attention:    Ashok EM Sudhakar

(c)    if to Buyer:
SCI Pavement Services, LP
1450 N. Fitzgerald Ave.
Rialto, CA 92376
Tel: (909) 879-2933
Fax: (909) 879-2939
Attention: Abi Adeoti

*with a copy (which shall not consititue notice) to:*
K&L Gates LLP
599 Lexington Avenue
New York, NY 10022
Tel: (212) 536-4877

Fax: (212) 536-3901
Attention: Harvey K. Newkirk, Esq.

and

K&L Gates LLP
10100 Santa Monica Blvd., 7th Floor
Los Angeles, CA, 90067
Tel: (310) 552-5021
Fax: (310) 552-5001
Attention: Jeryl A. Bowers, Esq.

or to such other address or addresses as Secured Creditor, Debtor, Sudhakar or Buyer have designated by notice to the other in writing. All notices shall be deemed to have been duly given (a) upon receipt if delivered in person, (b) one (1) business day after having been delivered to a recognized overnight courier service, (c) three (3) business days after having been deposited in the mail as set forth above, or (d) on the same day as sent if delivered by facsimile during regular business hours followed by first class mail, postage prepaid.

## 19.  WAIVERS.

Any party may, by written notice to the other parties (a) extend the time for the performance of any of the obligations or other actions of another party under this Agreement; (b) waive any inaccuracies in the representations or warranties of another party contained in this Agreement or in any document delivered pursuant to this Agreement; (c) waive compliance with any of the conditions or covenants of another party contained in this Agreement; or (d) waive performance of any of the obligations of another party under this Agreement. Except as provided in the preceding sentence, no action taken pursuant to this Agreement, including, without limitation, any investigation by or on behalf of a party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representations, warranties, covenants or agreements contained in this Agreement. The waiver by a party of, or the failure of a party to take any action against, a breach of this Agreement or default by the other party shall not operate or be construed as a waiver of such party's right to enforce any provision hereof, or of such party's right to take any action with respect to any subsequent or other breach.

## 20.  REMEDIES NOT EXCLUSIVE.

Except as otherwise specifically provided in herein, each and every remedy for a breach or violation or termination hereof shall be cumulative and shall be in addition to all other remedies available now or hereafter at law or equity or both.

## 21.  NO THIRD-PARTY BENEFICIARIES.

It is the explicit intention of the parties hereto that no person or entity other than the parties hereto, including without limitation any officer or employee of any party, is or shall

be entitled to bring any action to enforce any provision of this Agreement against any of the parties hereto, and that the covenants, undertakings and agreements set forth in this Agreement shall be solely for the benefit of, and shall be enforceable only by, the parties hereto and their respective successors and assigns as permitted hereunder.

## 22. MISCELLANEOUS.

This Agreement will bind, benefit and be enforceable by and against the parties, their respective heirs, personal representatives, estates, successors and assigns. This Agreement may be executed in any number of counterparts, including, by facsimile or other electronic transmission, each of which when so executed and delivered will be an original hereof, and it will not be necessary in making proof of this Agreement to produce or account for more than one counterpart hereof. This Agreement shall be construed, governed and enforced in accordance with the laws of the State of California. In any action or proceeding arising from or relating to this Agreement, the parties agree that the jurisdiction and venue shall be exclusively in the federal and state courts located in the County of San Bernardino, State of California, and each party waives any objection it may have with respect to the jurisdiction of such courts or the inconvenience of such forum or venue. This Agreement has been negotiated by the parties and their respective legal counsel and will be fairly interpreted in accordance with its terms and provisions without any strict construction in favor of or against either party. If any term or provision of this Agreement is found by a court of competent jurisdiction to be illegal, invalid or otherwise unenforceable, such term or provision shall not affect the other terms and provisions of this Agreement, or the whole of this Agreement, but such term or provision shall be deemed modified to the extent necessary in the court's opinion to render such term or provision enforceable, and the rights and obligations of the parties shall be construed and enforced accordingly, preserving to the fullest permissible extent the intent and agreement of the parties.

*[Remainder of Page Intentionally Left Blank]*

**SECURED CREDITOR:**

PALM DESERT NATIONAL BANK

By:
Name: *ROBERT W. FRANKS*
Title: *SENIOR VICE PRESIDENT*

**DEBTOR:**

SUDHAKAR COMPANY INTERNATIONAL

By: _____
Name:
Title:

**SUDHAKAR:**

ASHOK EM SUDHAKAR (f/k/a Ashok
Sudhakar)

_____
Name: Ashok EM Sudhakar, as an individual

19

**SECURED CREDITOR:**

PALM DESERT NATIONAL BANK

By: _____
Name:
Title:

**DEBTOR:**

SUDHAKAR COMPANY INTERNATIONAL

By: *Ashok EM Sudhkr*
Name: Ashok EM Sudhakar
Title: *President*

**SUDHAKAR:**

ASHOK EM SUDHAKAR (f/k/a Ashok
Sudhakar)

*Ashok Sudhkr*
Name: Ashok EM Sudhakar, as an individual

BUYER:

SCI PAVEMENT SERVICES, LP

By:  SCI Pavement Services GP, LLC,
     its General Partner:

By: _____
Name: Joyce Johnson-Miller
Title: Managing Member

INDEMNITOR:

L2 PAVEMENT, INC.

By: _____
Name: Joyce Johnson-Miller
Title:  President

Address:

Agreement of Sale and Secured Creditor's Bill of Sale
Signature Page

20

**Exhibit A-1**

### List of SCI Loan Agreements

1.  Business Loan Agreement entered into as of August 19, 2004 by and between Sudhakar Company International, as borrower, and Palm Desert National Bank, as lender (as amended, restated and supplemented from time to time, and as noted in Palm Desert National Bank's records as account number 7299/17306).

2.  Business Loan Agreement entered into as of February 17, 2004 by and between Sudhakar Company International, as borrower, and Palm Desert National Bank, as lender (as amended, restated and supplemented from time to time, and as noted in Palm Desert National Bank's records as account number 7299/17194).

3.  Business Loan Agreement entered into as of June 29, 2006 by and between Sudhakar Company International, as borrower, and Palm Desert National Bank, as lender (as amended, restated and supplemented from time to time, and as noted in Palm Desert National Bank's records as account number 001-746459).

**Exhibit A-2**

### List of SCI Affiliate Loan Agreements

1. Business Loan Agreement entered into as of February 12, 2004 by and between Ash Sudhakar, as borrower, and Palm Desert National Bank, as lender (as amended, restated and supplemented from time to time, and as noted in Palm Desert National Bank's records as account number 7300/47195).

2. Business Loan Agreement entered into as of October 1, 2007 by and between Sudhakar Management Services, LLC, as borrower, and Palm Desert National Bank, as lender (as amended, restated and supplemented from time to time, and as noted in Palm Desert National Bank's records as account number 001-746699).

3. Business Loan Agreement entered into as of January 10, 2008 by and between Penn Woods Corporation, as borrower, and Palm Desert National Bank, as lender (as amended, restated and supplemented from time to time, and as noted in Palm Desert National Bank's records as account number 783864642).

4. Business Loan Agreement entered into as of January 10, 2008 by and between EAS Investment and Development, LLC, as borrower, and Palm Desert National Bank, as lender (as amended, restated and supplemented from time to time, and as noted in Palm Desert National Bank's records as account number 783864455).

**Exhibit A-3**

**List of Security Agreements**

1.  Commercial Security Agreement entered into as of August 19, 2004 by and between Sudhakar Company International, as grantor, and Palm Desert National Bank, as lender (as amended, restated and supplemented from time to time, and as noted in Palm Desert National Bank's records as account number 7299/17306).

2.  Commercial Security Agreement dated as of February 17, 2004 by and between Sudhakar Company International, as grantor, and Palm Desert National Bank, as lender (as amended, restated and supplemented from time to time, and as noted in Palm Desert National Bank's records as account number 7299/17194).

Exhibit A-4

**Promissory Notes**

1.    Promissory Note dated August 19, 2004 executed on behalf of Sudhakar Company International in the name of Palm Desert National Bank in the amount of $150,000 (as amended, modified and supplemented).

2.    Promissory Note dated February 17, 2004 executed on behalf of Sudhakar Company International in the name of Palm Desert National Bank in the amount of $252,500 (as amended, modified and supplemented).

3.    Promissory Note dated June 29, 2006 executed on behalf of Sudhakar Company International in the name of Palm Desert National Bank in the amount of $250,000 (as amended, modified and supplemented).

4.    Promissory Note dated February 12, 2004 executed on behalf of Ash Sudhakar in the name of Palm Desert National Bank in the amount of $805,673.66 (as amended, modified and supplemented).

5.    Promissory Note dated October 1, 2007 executed on behalf of Sudhakar Management Services, LLC in the name of Palm Desert National Bank in the amount of $83,351.08 (as amended, modified and supplemented).

6.    Promissory Note dated January 10, 2008 executed on behalf of Penn Woods Corporation in the name of Palm Desert National Bank in the amount of $300,000 (as amended, modified and supplemented).

7.    Promissory Note dated January 10, 2008 executed on behalf of EAS Investment and Development, LLC in the name of Palm Desert National Bank in the amount of $182,250 (as amended, modified and supplemented).

**Exhibit B-1**

## Purchased Assets

The Purchased Assets are as follows:

(a)     any and all of Debtor's accounts, including accounts receivables, contract rights, health care insurance receivables, and all other forms of monetary obligations owing to Debtor, and all credit insurance, guaranties, or security therefore, irrespective of whether earned by performance;

(b)     any and all books and records of Debtor, including all records (including maintenance and warranty records), ledgers, computer programs, disc or tape files, printouts, runs, and other computer prepared information indicating, summarizing, or evidencing any of the Purchased Assets;

(c)     any and all of Debtor's tangible chattel paper, electronic chattel paper, and intangible chattel paper;

(d)     any and all of Debtor's commercial tort claims;

(e)     any demand, time, savings, passbook or similar account maintained by or for the benefit of Debtor with an organization that is engaged in the business of banking including a bank, savings bank, savings and loan association, credit union or trust company, and all funds and amounts therein, whether or not restricted or designated for a particular purpose; *provided, however,* the Purchased Assets shall not include any of Debtor's cash or any bank accounts listed on Exhibit B-2;

(f)     any and all documents and documents of title, including bills of lading, dock warrants, dock receipts, warehouse receipts and other documents of Debtor, whether or not negotiable, and all other documents which purport to be issued by a bailee or agent and purport to cover goods in any bailee's or agent's possession which are either identified or fungible portions of an identified mass, including such documents of title made available to Debtor for the purpose of ultimate sale or exchange of goods or for the purpose of loading, unloading, storing, shipping, manufacturing, processing or otherwise dealing with goods in a manner preliminary to their sale or exchange;

(g)     any and all of Debtor's equipment, wherever located, including machinery, furniture, furnishings, fixtures, computer and other electronic data processing equipment and other office equipment and supplies, computer programs and related data processing software, spare parts, tools, motors, automobiles, trucks, tractors and other motor vehicles, rolling stock, jigs, and other goods (other than inventory, farm products and consumer goods), including software embedded in such goods, together with any and all parts, improvements, additions, attachments, replacements, accessories and substitutions thereto or therefore, and all other rights of Debtor relating thereto, whether in the possession and control of Debtor, or in the possession and control of a third party for the account of Debtor; *provided, however,* the Purchased Assets shall not include any of the specifically excluded equipment listed on Exhibit B-3(B);

(h)    any and all of Debtor's general intangibles, payment intangibles, and any other intangible personal property of every kind and description, including: (i) contracts and contract rights, construction agreements, architect's contracts, noncompetition covenants, licensing and distribution agreements, indemnity agreements, guaranties, insurance policies, franchise agreements, and lease agreements; (ii) uncertificated certificates of deposit, and interests in any joint ventures, partnerships or limited liability companies; (iii) choses in action and causes of action (whether legal or equitable, whether in contract or tort or otherwise, and however arising); (iv) licenses, approvals, permits or any other authorizations issued by any government authority to the extent such licenses, approvals, permits or authorizations may be sold and transferred; (v) computer software, magnetic media, electronic data processing files, systems and programs, (vi) rights of stoppage in transit, replevin and reclamation, rebates or credits of every kind and nature to which Debtor may be entitled; (vii) purchase orders, customer lists, subscriber lists and goodwill, (viii) monies due or recoverable from pension funds, refunds and claims for tax or other refunds against any Governmental Authority, (ix) payment intangibles, and (x) other contractual, equitable or legal rights of whatever kind and nature;

(i)    any and all negotiable instruments, and every other writing which evidences a right to the payment of a monetary obligation;

(j)    any and all of Debtor's goods (including software embedded in such goods) of every kind and description (including goods in transit) which are held for sale or lease, or to be furnished under a contract of service or which have been so leased or furnished, or other disposition, wherever located, including those held for display or demonstration or out on lease or consignment or are raw materials, works in process, finished materials, or materials used or consumed or to be used or consumed, in Debtor's business, and the resulting product or mass, and all repossessed, returned, rejected, reclaimed and replevied goods, together with all materials, parts, supplies, packing and shipping materials used or usable in connection with the manufacture, packing, shipping, advertising, selling or furnishing of such goods; and all other items hereafter acquired by Debtor by way of substitution, replacement, return, repossession or otherwise, and all additions and accessions thereto, and any document representing or relating to any of the foregoing; *provided, however,* the Purchased Assets shall not include any of Debtor's goods listed on <u>Exhibit B-4</u>;

(k)    any and all of the following items owned or held by Debtor or in which Debtor otherwise has any interest, including but not limited to: (i) all patents and patent applications, domestic or foreign, all licenses relating to any of the foregoing and all income and royalties with respect to any licenses, all rights to sue for past, present or future infringement thereof, all rights arising therefrom and pertaining thereto and all reissues, divisions, continuations, renewals, extensions and continuations in part thereof; (ii) all copyrights and applications for copyright, domestic or foreign, together with the underlying works of authorship (including titles), whether or not the underlying works of authorship have been published and whether said copyrights are statutory or arise under the common law, and all other rights and works of authorship, all rights, claims and demands in any way relating to any such copyrights or works, including royalties and rights to sue for past, present or future infringement, and all rights of renewal and

extension of copyright; (iii) all state (including common law), federal and foreign trademarks, service marks and trade names, all licenses relating to any of the foregoing and all income and royalties with respect to any licenses, whether registered or unregistered and wherever registered, all rights to sue for past, present or future infringement or unconsented use thereof, all right arising therefrom and pertaining thereto and all reissues, extensions and renewals thereof; (iv) all trade secrets, confidential information, customer lists, license rights, advertising materials, operating manuals, methods, processes, know-how, sales literature, sales and operating plans, drawings, specifications, blue prints, descriptions, inventions, name plates and catalogs, and (v) the entire goodwill of or associated with the business conducted by Debtor connected with and symbolized by any of the aforementioned properties and assets;

(l)    all of Debtor's investment property;

(m)    any and all of Debtor's letters of credit, letter of credit rights, advises of credit, certificates of deposit, notes, drafts and instruments; and

(n)    any and all of Debtor's money or property that is receivable or received from or upon the sale, lease, license, collection, use, exchange or other disposition, whether voluntary or involuntary of any of Debtor's property that would constitute Purchased Assets but for such sale, lease, license, collection, use, exchange or other disposition (the "Prior Collateral"), including "proceeds" as defined in the California Commercial Code, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to or for the account of Debtor from time to time with respect to any of the Prior Collateral, any and all payments made or due and payable to Debtor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Prior Collateral by any governmental authority, any and all amounts from time to time paid or payable under or in connection with any of the Prior Collateral or for or on account of any damage, or injury, to or conversion of any of the Prior Collateral by any person, any and all other tangible or intangible property received upon the sale or disposition of any of the Prior Collateral, and all proceeds of proceeds.

**Exhibit B-2**

**Excluded Bank Accounts**

1.  General Account: Open
    Union Bank of California
    Business Bank of California
    505 West 2nd Street
    San Bernardino, CA 92401
    #5811010585

2.  Payroll Account: Open
    Union Bank of California
    Business Bank of California
    505 West 2nd Street
    San Bernardino, CA 92401
    #4910000026

3.  General Account:  Open, not in use
    Citizens Business Bank
    1201 E. Katella Ave.
    Orange, CA 92867
    #027501680

4.  Payroll Account:  Open, not in use
    Citizens Business Bank
    1201 E. Katella Ave.
    Orange, CA 92867
    #027501672

5.  Other Account – Closed
    Palm Desert National Bank
    Palm Desert Branch
    73-745 El Paseo
    P.O. Box 1777 (92261)
    Palm Desert, CA 92260
    #094149

**Exhibit B-3(A)**

**Included Equipment**

| Manufacturer | Model | Asset Type | Serial No. / | Year |
|---|---|---|---|---|
| GMC | 6500 | Truck | 1GDJ6H1J6VJ514344 | 1997 |
| Ford | F800 | Truck | 1FDXF80C6SVA26528 | 1995 |
| GMC | | Dump Truck | 1GDP7DIG3JV536079 | 1988 |
| Volvo | WXLL64 | Truck | 4V5DCFHD4TR716709 | 1996 |
| Bobcat | | Skid Steer Loader | 514418510 | |
| Volvo | WXLL64 | Truck | 4V2HC6UE81N322857 | 2001 |
| GMC | C6500 | Truck | 1GDJ6HICOXJ500363 | 1999 |
| International/Navistar | 3100 | Truck | 1HTHBGBN5LH699617 | 1998 |
| Zieman | | | 1ZCE28S27WZP20550 | 1998 |
| Sterling | LT7501 | Truck | 2FZNRJCB4XAA74105 | 1998 |
| GMC | C6500 | Truck | 1GDJ6HIC4XJ506893 | 1998 |
| International/Navistar | 8100 | Dump Truck | 1HTHBAHR4SH203051 | 1995 |
| GMC | C6500 | Truck | 1GBJ7H1C3YJ514748 | 2000 |
| Isuzu | NQR | Truck | JALE5B14017901333 | 2001 |
| Isuzu | NQR | Truck | JALE5B14717901331 | 2000 |
| Apache | | | 5JRUE10143C1270 | |
| Sterling | SC8000 | Truck | 49H6WFAA61HG32394 | 2000 |
| Hino | FE2620 | Truck | JHBFE2JP131S11152 | 2002 |
| Ford | F-450XL Super Duty | Truck | 1FDXF46P53ED35900 | 2003 |
| Case | 90XT | Skid Steer Loader | JAF398189 | 2004 |
| Ford | F-350 | Truck | 1FDKF37M9MKA94709 | 1991 |
| Ford | CF7000 | Truck | 9BFXH70P4LDM01471 | 1990 |
| Zieman | | Trailer | 1ZCT27SXGZP13076 | |
| Ford | F-150 | Pickup Truck | 1FTPX17L71NA69563 | 2001 |
| Ford | F-350 | Pickup Truck | 1FTSX30F6XEB83654 | 1998 |
| Isuzu | NPR | Truck | JALB4B14517003476 | 2000 |
| Chevrolet | Avalanche | Truck | 3GNEC12087G311091 | 2007 |
| Ford | F-550 Super Duty | Truck | 1FDAF56F3XEB54481 | 1999 |
| Isuzu | NQR | Truck | JALE5B14717902222 | 2001 |
| Chevrolet | 3500 Cheyenne | Truck | 1GBHR34K1KJ104830 | 1989 |
| International/Navistar | 4900 | Truck | 1HTSDAAN5VH449571 | 1996 |
| International | 1654 | Truck | 1HTLAHGM7GHA29529 | 1986 |
| Bobcat | 863 | Skid Steer Loader | 514417825 | 1998 |
| Ford | F-250XLT | Pickup Truck | 1FTHX25G5NKB76554 | 1992 |
| Ford | F-350 | Truck | 1FDKF37H4JKA70025 | 1988 |
| Chevrolet | S10 | Pickup Truck | 1GCCS19Z2J8231838 | 1988 |
| International | 1754 | Truck | 1HTLCHWL7EHA22001 | 1983 |
| Ford | F-150 | Pickup Truck | 1FTPW145X4KA84668 | 2004 |
| Ford | F-250 | Utility Truck | 2FDHF25H7TCA26759 | 1996 |
| Allmand | Eclipse | | 0280AB06 | |
| Allmand | | | 0185AB05 | |
| Amida | ODLSC25 | | 9605-35434 | |
| Amida | ODLSC25LA | | 9608-36719 | |
| Terex Amida | ODLSE25LA | | 0004-64629 | |
| Mitsubishi | FGC25K | Forklift Truck | AF82C00375 | 1999 |
| Toyota | 6FGCU30 | Forklift Truck | 60752 | 1998 |
| Toyota | 7FGCU30 | Forklift Truck | 60911 | 2002 |
| White | MY30 | Forklift Truck | 620020 | |
| Ingersoll-Rand | SSRUP6-30-125 | Air Compressor | PX3420U04160 | 2004 |
| Ingersoll-Rand | TMS0140 | Refrigerated Air Dryer | 40313318 | 2004 |
| Miller | Millermatic 250 | Arc Welder | N/A | |
| Miller | Spectrum 625 | Plasma Cutter | LF280406P | 2005 |
| Miller | Thunderbolt | Arc Welder | LA047061 | 2000 |

| Manufacturer | Model | Asset Type | Serial No. / | Year |
|---|---|---|---|---|
| | XL225/150 | | | |
| DeWalt | DW705 | Compound Miter Saw | 67796 | |
| Ridgid | CM14500 | Compound Miter Saw | XX065082732 | |
| Ryobi | BGH827 | Bench Grinder | W0638 | |
| Sears Craftsman | 113.213171 | Floor Type Drill Press | 9725700080 | |
| Undefined Make | | Metal Pallet Racking | | |
| Undefined Make | | Support Equipment | | |
| Undefined Make | | IT Equipment; Business Machines | | |
| Undefined Make | | Office Furniture and Fixtures | | |
| | | Asst. Arrow Boards Not in Service | | |
| Itek Storage Systems | | Tank | 15522 | |
| Undefined Make | | Miscellaneous Equipment - Yard | | |
| Unknown Manufacturer | | Bead Hopper | | |
| Kenworth | T300 | Truck | 3BKMHD7X3WF781052 | 1998 |
| Isuzu | | Truck | 4GTJ7C130XJ601275 | 2000 |
| Chevrolet | C-30 | Truck | 1GBJC34M0FS142568 | 1985 |
| Ford | F-350 | Truck | F37YRU85853 | 1974 |
| Ford | F-450 | Truck | 2FDLF47G5MCA35648 | 1991 |
| Hino | FB1817 | Truck | JHBFB4JGXW1S10400 | 1998 |
| Ford | F-450 Super Duty | Truck | 1FDLF47G9SEA38799 | 1995 |
| Hino | FH2618 | Truck | JHBFE5HP0S2S10333 | 1995 |
| Mack | | Truck | VG6M111AXEB018962 | 1984 |
| Ford | F-550 | Truck | 1FDAF56FXXEA93145 | 1999 |
| Chevrolet | 3500HD | Truck | 1GBKC34N1SJ115313 | 1995 |
| Hino | SG3325 | Truck | JHBSG1JM4X1S10057 | 1999 |
| GMC | T6500 | Truck | 1GDG6C1C0WJ521404 | 1998 |
| Caterpillar | 50/GC25 | Forklift | 4EM00848 | |
| Smith | | Hand Grinder | 20402 | |
| Von Arx | FR200 | Hand Grinder | 62557 | |
| Graco | Line Lazer 3 | Hand Paint Striper | | |
| Jacobsen | | Riding Grinder | 66013-2350 | |
| | | Hand Stencils | | |
| Line Master | Master Liner | Thermo Cart | 9504021 | |
| | Gal Seal Tanker | | CA881213 | |
| | Internation Dump Truck | | 2HTNDHXN2ECB11990 | |
| | Trailer AZ Tee | | 4ZBHE21678F002722 | |
| | Sulphate Trailer | | 1E9DPJ728K1094023 | |
| | Peterbilt | | 1XPAXEEX7RD352290 | |
| | LT9000 | | 1FDYU90U1SVA44783 | |
| | Trailer | | 1TKA04627SM068322 | |
| | 344 IT Loader | | LU344HX710138 | |
| | Emul Tanker | | 1H4T04329BJ008305 | |
| | Haul Tanker | | 1XPADBOX5YN457269 | |
| | Steel Storage Box | | | |
| | 1500 Gal. Seal Tanker | | 9DWWT7H37JC000940 | |
| | Lawn Mower | | | |
| | Cutoff Saw | | | |
| | Supershot | | 1C9SY1014X1418317 | |
| | CARSON | Trailer-carrier | 4HXDT12217C123537 | 2007 |

**Exhibit B-3(B)**

**Excluded Equipment**

| Manufacturer | Model | Asset Type | Serial No. / | Year | Lessor |
|---|---|---|---|---|---|
| GPS | | | | | Zions |
| Ford | CF7000 | Truck | 1FDXH81C8VVA27256 | 1997 | Zions |
| Nissan | 2300LP | Truck | JNALC80H96AH55200 | 2006 | Center Capital |
| UD | | Truck | JNALC80H66AH55199 | 2006 | Center Capital |
| GMC | T8500 | Truck | 1GDT8F4334F518387 | 2004 | LaChance |
| Hino | | Truck | JHBNV8JT25IS10123 | 2005 | Republic |
| Nissan | 2300LP | Truck | JNALC43H54AH75137 | 2004 | Republic |
| GMC | C-5500 | Truck | 1GDE5C1205F534561 | 2005 | Center Capital |
| Nissan / UD | 2600LP | Truck | JNAPA80H36AS55053 | 2006 | Center Capital |
| Cadillac | Escalade | | 1GYEC63828R152221 | | GMAC |
| Chevrolet | Avalanche | | 3GNFK12328G150529 | | GMAC |
| GMC | C-5500 | Utility Truck | 1GDE5C1276F413737 | 2006 | Center Capital |
| Autocar | XPEDITOR | Truck | 5VCH6MF07H203612 | 2006 | Zions |
| Ford | F-150 | Pickup Truck | 1FTRX12W37NA22663 | 2007 | Ford |
| UD | 2300LP | Truck | JNALC80H27AH60126 | 2007 | Zions |
| | Pickup (Superduty) | Pickup Truck | 1GCHK23607F514124 | 2007 | GMAC |
| Ford | F-150 XLT | Pickup Truck | 1FTPW12597KC52940 | 2007 | Ford |
| Isuzu | NQR | Truck | JALE5B141Y7902078 | 2000 | Zions |
| Isuzu | NQR | Truck | JALE5B14517902512 | 2000 | Zions |
| Chevrolet | Silverado 1500 | Pickup Truck | 2GCEC13C1711640077 | 2007 | GMAC |
| Chevrolet | 2500 | Pickup Truck | 1GCHC29K97E585460 | 2007 | GMAC |
| Isuzu | NPR | Truck | JALE5B16977300240 | 2007 | Zions |
| Autocar | XPEDITOR | Truck | 5VCHC6MF77H203963 | 2006 | Republic |
| Sterling | SC8000 | Truck | 49HAADBV76DV77142 | 2006 | Zions |
| Hino | 338 | Truck | 5PVNV8JTX62S50163 | 2006 | Center Capital |
| Ford | F-150 | Pickup Truck | 1FTRX12WX6FA21521 | 2006 | Ford |
| | BobCats | | 563012765 | | GE Cap |
| | New Slurry Truck | | 1FUYFSEBOYLG08470 | | Zions |
| | Sealmaster Buggie | | EL020-52 | | Zions |
| Volvo | WXLL64 | Truck | 4V2HC2HE8YN254797 | 1999 | Ford |
| Chevrolet | Super Truck | | 1GCHK29657E528677 | | GMAC |
| Mack | | Truck | 1M2K197C75MO27721 | | LaChance |
| | T.C. Truck | | J8DE5B16457902489 | | Republic |
| Ford | F-150 | Pickup Truck | 1FTPX125X7KC61059 | 2007 | Ford |
| Ford | E150 | Van | 1FTNE14W97DB49716 | | Ford |
| Ford | F-150 | | 1FTRF12W97NA46534 | | Ford |
| Ford | F-150 | | | | Ford |
| Ford | F-150 | | 1FTRX12W67NA02200 | | Ford |
| Ford | | Pickup Truck | 1FTRX12W06NB86399 | 2006 | Ford |
| | Food Equipment | | | 2007 | Zions |
| Ford | F-250 | Pickup Truck | 1FTSX20R68EA65688 | 2007 | Ford |
| Ford | F-150 | Pickup Truck | 1FTRX12WX7FA88525 | 2007 | Ford |
| GMC | | Flat Bed Truck | 1GDHR34K6HJ511042 | 1987 | Consley Montigny |
| GMC | | Flat Bed Truck | 1GDG7D1B0GV514778 | 1986 | Consley Montigny |
| Ford | | Pick Up Truck | 2FTJW3512HCA02097 | 1987 | Consley Montigny |
| Ford | | Flat Bed Truck | 2FDKF37G2PCA47489 | 1993 | Consley Montigny |
| Chevrolet | | Paint Stripper | CCL337Z18417 | 1977 | Consley Montigny |
| Ford | | Paint Stripper | 2FDLF47G2LCB32515 | 1990 | Consley Montigny |
| Dodge | | Pick Up Truck | 1B7MC33G65XJ574737 | 1999 | Consley Montigny |
| Chevrolet | | Flat Bed Truck | 1GBHR34K4KF304619 | 1989 | Consley Montigny |
| Dodge | | Pick Up Truck | 1B7ME36C9MS325732 | 1991 | Consley Montigny |
| Dodge | | Pick Up Truck | 1B7ME368XMS206373 | 1991 | Consley Montigny |
| | MSJS | Paint Stripper Drive Cart | MSJS fabricated | 1985 | Consley Montigny |

| Manufacturer | Model | Asset Type | Serial No.  / | Year | Lessor |
|---|---|---|---|---|---|
| | MSJS | Paint Stripper Drive Cart | MSJS fabricated | 1985 | Consley Montigny |
| | Trlmo | Box Trailer | 1PT01AAJ5L9004782 | 1990 | Consley Montigny |
| | | Trailer-carrier | CAL238908 | 1979 | Consley Montigny |
| | MEI | Trailer-carrier | MM210T | 1981 | Consley Montigny |
| | SPCNS | Trailer-carrier | CA574385 | 1980 | Consley Montigny |
| | ZIEMA | Trailer-carrier | 1ZCT18E23MZP16580 | 1991 | Consley Montigny |
| | SPCNS | Trailer-carrier | CAL238908 | 1980 | Consley Montigny |
| | SPCNS | Trailer-carrier | CAL282075 | 1981 | Consley Montigny |
| | SPCNS | Trailer-carrier | CA677444 | 1980 | Consley Montigny |
| | | Paint pumps | | | Consley Montigny |
| | | Stencils | | | Consley Montigny |
| | | Hand Paint Carts | | | Consley Montigny |

**Exhibit B-4**

**Excluded Goods**

Goods provided on consignment by Ennis Paint.

**Exhibit C**

Form of Transfer Statement

### TRANSFER STATEMENT
**Effective as of December [____], 2009**

THIS TRANSFER STATEMENT ("Transfer Statement") is presented pursuant to the provisions of Section 9619 of the Uniform Commercial Code, effective in California ("UCC"). As required by the UCC, upon receipt of this Transfer Statement, the [_____] shall (i) accept the Transfer Statement, and (ii) promptly amend its records to reflect the transfer described herein.

1. SECURED OBLIGATIONS. Sudhakar Company International, a California corporation ("Debtor"), certain affiliates of Debtor and Palm Desert National Bank ("Secured Party"), entered into several Business Loan Agreements, as amended (the "Business Loan Agreements"), pursuant to which Secured Party extended financial accommodations to or for the direct or indirect benefit of Debtor and its affiliates. To secure the payment and performance of the obligations of Debtor and its affiliates under the Business Loan Agreements, Debtor and its affiliates each entered into various Security Agreements, each dated as of even date with the relevant Business Loan Agreement (collectively, the "Security Agreements"), whereby Debtor and its affiliates granted to Secured Party a continuing perfected security interest in and lien upon all the assets of Debtor and its affiliates (the "Collateral").

2. DEFAULT. Debtor defaulted on its obligations to Secured Party with respect to each of the Business Loan Agreements.

3. EXERCISE OF POST-DEFAULT REMEDIES. Secured Party has foreclosed upon the Collateral of the Debtor, and sold the Collateral at a private foreclosure sale pursuant to Section 9610 of the California Commercial Code to SCI Pavement Services, LLC ("Transferee").

4. TRANSFEREE'S RIGHTS IN TRANSFERRED COLLATERAL. As a result of Secured Party's foreclosure sale, and pursuant to the terms of that certain Agreement of Sale and Secured Creditor's Bill of Sale, dated as of December 31, 2009, Tranferee has acted in good faith and acquired all right, title and interest of Debtor in the transferred Collateral. Further the Secured Party's interest under which the foreclosure sale was made and all subordinate security interests or liens against the Collateral have been discharged.

5. NAMES; MAILING ADDRESSES. The name and mailing address of Debtor, Secured Party, and Transferee are as follows:

**Debtor:**

Sudhakar Company International
7500 W. Lake Mead Blvd. #942
Las Vegas, NV 89128

**Secured Party:**

Palm Desert National Bank
Palm Desert Branch
73-745 El Paseo
P.O. Box 1777 (92261)
Palm Desert, California 92260

**Transferee:**

SCI Pavement Services, LP
1450 N. Fitzgerald Avenue
Rialto, California 92376

**PALM DESERT NATIONAL BANK**

By: _____
Name
Title